**IN THE COURT OF APPEALS OF IOWA**

No. 25-0057
Filed May 21, 2025

**IN THE INTEREST OF A.T.,**
**Minor Child,**

**K.T., Mother,**
       **Appellant,**

**R.S., Father,**
       **Appellant.**

_____

Appeal from the Iowa District Court for Linn County, Carrie K. Bryner, Judge.

Parents separately appeal the termination of their parental rights.
**AFFIRMED ON BOTH APPEALS.**

Deborah M. Skelton, Pleasant Hill, for appellant mother.

Ellen Ramsey-Kacena, Assistant Public Defender, Cedar Rapids, for appellant father.

Brenna Bird, Attorney General, and Tamara Knight, Assistant Attorney General, for appellee State.

Allison Courtney Ray Ackerman of Nidey Erdahl Meier & Araguas, PLC, Cedar Rapids, attorney and guardian ad litem for minor child.

Considered without oral argument by Schumacher, P.J., and Buller and Sandy, JJ.

**SCHUMACHER, Presiding Judge.**

Parents separately appeal the termination of their parental rights to their child. Both challenge the sufficiency of the evidence supporting the grounds for termination and claim the State failed to prove the Iowa Department of Health and Human Services (the department) made active efforts to reunify them with their child. The mother also claims termination is not in the child's best interests due to the closeness of the parent-child relationship. And the father claims the court should have placed the child in a guardianship with a maternal aunt in lieu of terminating parental rights. Upon our review, we affirm on both appeals.

I.      **Background Facts and Proceedings**

This family came to the department's attention most recently in August 2023,[1] at the time of A.T.'s birth, due to concerns of methamphetamine use by the mother. The parents have a history of substance use and domestic violence. Several years prior, the parents' older child was removed from their custody at birth due to those same issues. Jurisdiction of that proceeding was transferred to tribal court,[2] and the case ended with the child's placement in a guardianship with a maternal great aunt. Here, upon A.T.'s removal from the parents' custody, the child was placed with that relative.

A.T. was adjudicated in need of assistance, and services were initiated for the family. The tribe intervened but declined to have jurisdiction transferred to the tribal court.

---

[1] Neither the child nor the mother tested positive for methamphetamine at the time of the child's birth. Although the mother maintained she was going to challenge the basis for the child's removal, she did not do so.
[2] The father is a member of the Sac & Fox Tribe of the Mississippi in Iowa.

The mother entered residential treatment at Heart of Iowa. In October, the department authorized a trial home placement of the child with the mother, under the condition the mother remain at Heart of Iowa. The trial placement was suspended briefly in late October but resumed within a few weeks. In December 2024, the mother completed the residential portion of treatment, and the department informed her that she needed to obtain employment or pursue education to continue residing there. The mother understood A.T.'s placement with her was contingent on her being at Heart of Iowa. In early January 2024, the mother informed the department that she was leaving the facility and returning to Marshalltown. When the caseworker arrived to pick up the child, she learned the mother's most recent drug test was positive for methamphetamine. The child was placed again with the aunt, where she has remained.

The mother's engagement in services waned after she moved to Marshalltown. She obtained a substance-use evaluation, which recommended extended outpatient services. The mother attended outpatient treatment sporadically. Her attendance at visits with the child was also inconsistent. She tested positive for methamphetamine on several occasions. She also missed drug tests. The State petitioned to terminate parental rights in March 2024.

Meanwhile, the father saw the child in the hospital after her birth despite a no-contact order between the parents.[3] After the child's initial removal, the father met with the caseworker and completed a home study. But the father decided not to participate in services because he believed the mother "was going to do what

---

[3] The father testified the no-contact order was in place between the parents from 2021 to late 2023.

needed to be done or whatever" and he "was trying to stay away from her and just let her do good and get it all done with." That was the only contact the department had with the father until after the termination petition was filed, despite repeated attempts by several providers to reach him. In late April, the father contacted the department to set up a visit with the child. The father confirmed the visit, but when the provider arrived with the child at the address the father provided, the father was not there. The provider waited for twenty minutes before leaving with the child to return her to the aunt's home.

The termination trial took place over three days in May, June, and July. The father testified he had seen the child "two or three" times during the mother's recent visits. The parents maintained they were "not together" but explained that the father attended the visits with the mother "so [A.T.] didn't freak out" because the child didn't know him. The father acknowledged he had not participated in services. The mother had changed residences several times, including living with the paternal grandfather, where the father lived.[4] The mother acknowledged she had tested positive for methamphetamine and marijuana "[s]ometime in June," in the midst of the termination trial. She believed she was "possibly" going to inpatient treatment in Fort Dodge and having A.T. placed with her would be incentive for her to stay sober. Both parents requested the court grant them additional time to work toward reunification if the court did not return the child to them immediately.

The department, the tribe, and the guardian ad litem recommended termination of parental rights. The court entered an order terminating both parents'

---

[4] The father denied the mother had lived there.

rights pursuant to Iowa Code section 232.116(1)(b), (e), and (h) (2024). The parents separately appeal.

## II. Standard of Review

We review termination-of-parental-rights proceedings de novo. *In re A.B.*, 957 N.W.2d 280, 293 (Iowa 2021). Upon our review, our primary consideration is the best interests of the child, *In re J.E.*, 723 N.W.2d 793, 798 (Iowa 2006), the defining elements of which are the child's safety and need for a permanent home, *In re H.S.*, 805 N.W.2d 737, 748 (Iowa 2011).

## III. Analysis

Because A.T. is a member of the Sac & Fox Tribe of the Mississippi in Iowa, the federal Indian Child Welfare Act (ICWA), coupled with Iowa law, controls our analysis. *See* Indian Child Welfare Act, 25 U.S.C. §§ 1911–1923 (covering child custody proceedings); Iowa Code chapter 232B (setting forth Iowa's Indian Child Welfare Act). These provisions have the dual purpose of protecting the best interests of the children and preserving Native American culture. *See* 25 U.S.C. § 1902; *In re D.S.*, 806 N.W.2d 458, 465 (Iowa Ct. App. 2011). In this case, the parents only raise ICWA provisions in the context of the active-efforts requirement discussed below.

In general, when reviewing termination-of-parental-rights proceedings under Iowa law, we follow a three-step analysis, asking whether (1) a statutory ground for termination is satisfied, (2) the child's best interests are served by termination, and (3) a statutory exception applies and should be exercised to preclude termination. *See In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022); *see also* Iowa Code § 232.116(1)–(3). The provisions of ICWA "are to be strictly construed

and applied to protect American Indian families." *In re C.A.V.*, 787 N.W.2d 96, 99 (Iowa Ct. App. 2010). Yet, even under an ICWA analysis, the paramount interest remains the protection of the best interests of the child. *In re J.L.*, 779 N.W.2d 481, 492 (Iowa 2009), *abrogated on other grounds by In re T.F.*, 972 N.W.2d 1, 9 (Iowa 2022).

### A. Statutory Grounds for Termination

The district court terminated the parents' parental rights on three statutory grounds, but we may affirm if one ground is supported by the record. *A.B.*, 957 N.W.2d at 313. We focus on section 232.116(1)(h), which entails our review of the parents' challenges to the court's determination that the child could not safely be returned to their custody. *See* Iowa Code § 232.116(1)(h)(4) (requiring the State to show by clear and convincing evidence that the child could not be returned safely to the custody of either parent at the time of the termination hearing).

Relating to the mother, we conclude the mother's active and unaddressed methamphetamine use precludes a finding that the child can be safely returned to her custody. Although the mother appeared to make some progress at the outset of this case while at Heart of Iowa, since she opted to leave the facility, she has made no consistent or meaningful strides toward sobriety. Despite the mother's testimony that having A.T. in her care is "motivation" "to stay sober," A.T.'s trial home placement ended with the mother's relapse in January 2024. And the mother has tested positive for methamphetamine several times since then. As the court observed, "In fact, the mother is in a much worse place than she was when the case opened." In short, "[i]t is unsafe for children to be returned to an environment where drug use is present, and the [mother] has yet to demonstrate

that [s]he can provide an environment free from such behavior." *In re A.T.*, No. 25-0119, 2025 WL 1085210, at *3 (Iowa Ct. App. Apr. 9, 2025).

Turning to the father, we find he offers no meaningful argument to support his claim. After paternity was established, the father did not participate in services at any time during this proceeding. He now admits his plan to let the mother handle the case "kind of backfired." As the court observed, "The father has engaged in a few visits between the first and last days of trial, but did nothing else. . . . [He has] not followed through with the Case Permanency Plan. [He] cannot be considered a safe placement at this time or any time in the reasonable future." Indeed, the father has not progressed past fully supervised visits, which in and of itself "prevent[s] an immediate return of custody." *In re L.H.*, 13 N.W.3d 627, 629 (Iowa Ct. App. 2024).

Based on these and the other facts detailed above, we concur with the court's assessment that the child could not be returned to the custody of either parent at the time of the termination hearing. Iowa Code section 232.116(1)(h) was satisfied.

**B.    Active Efforts**

Both parents claim the State failed to prove that the department provided active efforts to reunify them with A.T. "A party seeking . . . termination of parental rights over an Indian child shall provide evidence to the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." Iowa Code § 232B.5(19); *accord* 25 U.S.C. § 1912(d). Reviewing courts have interpreted active efforts to mean "a 'vigorous and

concerted level of casework beyond the level' typically constituting reasonable efforts." *D.S.*, 806 N.W.2d at 468 (quoting Iowa Code § 232B.5(19)). "The active efforts must be made in a manner that takes into account the prevailing social and cultural values, conditions, and way of life of the Indian child's tribe" and may include:

> a. A request to the Indian child's tribe to convene traditional and customary support and resolution actions or services.
> b. Identification and participation of tribally designated representatives at the earliest point.
> c. Consultation with extended family members to identify family structure and family support services that may be provided by extended family members.
> d. Frequent visitation in the Indian child's home and the homes of the child's extended family members.
> e. Exhaustion of all tribally appropriate family preservation alternatives.
> f. Identification and provision of information to the child's family concerning community resources that may be able to offer housing, financial, and transportation assistance and actively assisting the family in accessing the community resources.

Iowa Code § 232B.5(19).

The mother contends "the only requirement met by the State was the transportation assistance."[5] But the department offered family-centered services, solution-based casework, SafeCare services, family interactions, trial home placement, drug testing, child protective assessments, mental-health services, psychosexual evaluations, substance-use resources, paternity testing, relative placement, kinship navigator services, and transportation assistance. The

---

[5] We observe that transportation assistance was also offered for the father, although he failed to accept it for the most part. The provider transported A.T. to the father's home for the father's only scheduled visit and "they were willing to try to work with him to make sure that wasn't a barrier."

department was also in regular communication with tribal representatives, including tribal family services providers.

At the termination trial, a qualified expert witness who was an enrolled member of the tribe and had worked in Indian child welfare for twenty years testified. She stated she was "familiar with the culture, familiar with the family relations within our culture." She testified the tribe became involved with A.T.'s case during the "assessment phase" and that it had received subsequent "notifications on the case and updates" from the department. She stated the tribe denied the parents' request to transfer jurisdiction of the case to tribal court due to the mother's initial placement in residential treatment and her subsequent move to Marshalltown. The tribal expert opined the department "went above and beyond [with the mother's] visits," and she confirmed there was nothing more the department "could have done with this family to work towards reunification." *See In re Z.F.*, No. 23-1416, 2024 WL 1297009, at *7 (Iowa Ct. App. Mar. 27, 2024) ("The tribal expert witness confirmed that the department efforts were what 'I would have done every step the same.'"). Ultimately, she believed the department "made every effort to provide services and work with the family."

The tribal expert further opined it was in the child's best interests to terminate parental rights, despite the potential cultural implications. She testified:

> Q. From your knowledge of this case, is there anything cultural or traditional that the State is taking as a negative in this matter? A. No.
> Q. Would [A.T.] suffer serious emotional or physical damage if she were placed with her parents? A. Yes.
> Q. And is that based on the fact that the parents have not addressed the safety concerns that caused her to be removed? A. Yes, and there—Yes.

Q. And the tribe has approved the maternal aunt as a placement, is that correct? A. Yes.

Q. Do you believe that that maternal aunt is making active efforts to connect the child with the tribe and their culture? A. Yes.

Turning to the father's claim, he argues active efforts were not made because the department did not make adequate attempts to contact him.[6] The father maintains he "was simply ignored in this case." But the record reveals the opposite—the father repeatedly chose to ignore this case despite efforts by the department to enlist his involvement. When questioned specifically about whether the parents had taken advantage of services offered to them, the tribal expert testified:

Q. Have active efforts been made to reunify [A.T.] and her parents? A. I believe they have been offered. I believe active efforts were offered.

Q. Would it be accurate to say that the parents didn't take advantage of all of the things that were offered to them? A. Yes.

As noted above, this proceeding began at the time of A.T.'s birth in mid-August 2023. In August and September, the father communicated with the department. He stipulated to A.T.'s removal and adjudication, and he requested paternity testing prior to participating in services. The father reported that he lived on the settlement with his father, and he indicated he would like to be considered

---

[6] The father also claims the department failed to notify him that A.T.'s trial placement had ended. However, the record shows the father was aware the mother and child were no longer living at Heart of Iowa. Indeed, it appears the mother was living with the father. In a March report to the court, the guardian ad litem noted:

During this reporting period, I have had contact with HHS case manager . . . and [A.T.'s] current placement, [the maternal aunt]. I have not had any contact with [A.T.]'s father . . . as he has not engaged in the case. It is reported that [the parents] now live together at [the father]'s father's house.

for placement of the child. The court ordered a home study of the father's home, which was done. A social history was also completed. The father's paternity was established on October 2. The dispositional hearing took place two days later.

In the dispositional order, the court required the father to cooperate with drug testing four times per month, complete a substance-use evaluation, and complete a psycho-sexual evaluation. His visits with the child were to be fully supervised. However, the caseworker reported the father "has denied wanting services." The family support specialist (FSS) further reported, "During the recent court hearing, [the father]'s attorney expressed that he does not want to participate in any services at this time." FSS later reiterated the father had not been participating in services "of any kind" despite "attempt[s] to contact" him "to see if he wants to start services."

In a January 2024 report to the court, the department stated:

> Paternity test results were finalized on 10/2/2023 which established [the father]'s paternity. [The father] has chosen not to participate in services other than completing the home study and social history. There has been no interaction with [the father] in this reporting period. [The department caseworker] has reached out to [the father] via phone call on 10/30/23, 11/14/23, 12/5/23 and 1/16/24. [The department caseworker] has reached out to [the father] via text message 10/6/23, 10/18/23, 11/8/23, 12/21/23 and 1/18/24. There has been no response to these attempts at contact.

In a March report to the court, the department listed further attempts to reach the father by phone and text in February and March. The caseworker reported, "During this reporting period there has been no contact or involvement with [the father] despite this worker attempting contact." FSS similarly reported that the caseworker had "made attempts to contact [the father] and offer him visits with [A.T.] No response."

At the termination trial, the department caseworker reiterated that she had consistently attempted to contact the father, explaining, "Typically I would do at least a phone call a month and a text message or two a month, just checking in trying to make some contact." She testified drug testing was "discussed" "when we did the home study," which "was the only time [she] really got an opportunity to talk to him." The department scheduled testing, but the father did not participate. When asked what the department offered the father "in terms of active efforts" in this case, the caseworker testified:

> There were efforts by both myself and providers to connect with him and try to set up interactions, try to ensure that he understood the steps that were being asked of him. Without a response it was difficult to move forward with those, but the effort was continuously made to try to make sure he understood what was being asked and assistance as needed to complete those tasks.

The father agreed he "made the decision" not to engage in services. He acknowledged he ignored the department's attempts to contact him after the home study was completed. Then his phone plan lapsed while he "save[d] up the money so that [he] could get the phone that [he] wanted." He became aware A.T. was no longer in the mother's care "[a] little while after . . . she had gotten out of the Heart of Iowa or left it," and then he "got the letter in the mail just that all of this termination thing was happening." After the father reactivated his phone in April, he contacted the department to set up a visit. The provider arranged to transport the child to the father for the visit, and the father confirmed the visit the night before it was scheduled. Ultimately, the visit did not happen. The father testified he "went to help" a family member with a "tree that had fallen down" and he missed the visit. He did not reschedule, explaining, "No, I mean, we had court coming."

The father explained he hadn't participated in drug testing because he didn't have "[t]he drug testing number" "to be able to provide any testing." Yet he acknowledged that when his phone was turned on, the amount of contact he had received from the department was "probably about right." He also agreed he could have used his father's phone if he needed to. The father stated he didn't "reciprocate" the department's efforts to reach him because he thought the mother was handling the case and he "wanted to stay out of the picture."

On the issue of active efforts, the district court found:

> The Court does find that active efforts were provided in this case. Despite repeated monthly attempts, the father never responded to the case manager. Even after requesting a visit, he did not make himself available immediately. Once the visit was scheduled and confirmed, the father was not even at the home and therefore the visit could not occur. The expression, "you can lead a horse to water but can't make him drink" definitely pertains to this case. [The father] was contacted regularly, drug testing was set up for him and multiple other services would have been accessible if he had chosen to engage. However, the father believed that the mother was doing well and chose not to be a "distraction." He is a grown man who cannot be forced to participate unless he chooses to do so. However, his choice to absent himself from this case is not indicative of a lack of active efforts. On the contrary, active efforts were made and many more services were available to the father upon his engagement but he CHOSE not to avail himself of these active efforts. [The mother] was also offered active efforts through all of the services provided including additional visitation and transportation but did not even participate in all of the services offered. For example, she could have had more visitation at the placement home and did not take advantage of this. While some of the services offered to the parents may not differ substantially from those offered in a non-ICWA child in need of assistance case, [the tribal expert] specified that in most cases the State already offers active efforts even when the standard is reasonable efforts. She testified that the ICWA requirement of active efforts had been met in this case and there was nothing further that HHS could have done to work with the parents.

Upon our review, we concur with the court's conclusion that the department provided active efforts for both parents. We further note that "[w]hile [the father] is an enrolled member of the tribe, he admittedly never embraced his Indian heritage." *C.A.V.*, 787 N.W.2d at 103. The father stated he had not enrolled any of his children as members of the tribe because "it didn't do [him] any favors."[7] "The 'active efforts' requirement must be construed in the context of the existing circumstances where the Indian father has never bonded with either his tribe or his daughter." *Id.* at 104. We affirm on this issue.

## C.      Best Interests / Bond Exception

The mother also claims termination is not in the child's best interests due to the closeness of the parent-child relationship.[8] When determining best interests, we give primary weight to "the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional conditions and needs of the child." Iowa Code § 232.116(2). Here, these factors all weigh in favor of termination. We recognize the child shares a bond with the mother. But to avoid termination under section 232.116(3)(c), the "law requires clear and convincing evidence that 'termination would be detrimental to the child at the time due to the closeness of the parent-child relationship.'" *In re A.B.*, 956 N.W.2d 162, 169 (Iowa 2021) (quoting Iowa Code § 232.116(3)(c)). The department noted the mother missed "8 out of 8 interactions with [the child] for the

[7] He explained that he was concerned about his children "not being willing to work" because they received money from the tribe. However, we observe that after the first day of the termination trial, the father completed paperwork to register A.T. as a member of the tribe.

[8] The mother's petition conflates her best interest argument and permissive exception argument.

month of May," immediately preceding the termination trial. Meanwhile, the guardian ad litem opined the child "has been doing well in [the relative]'s care. She is in the same home as her brother. [A.T.] is a very smiley, healthy, baby." Under these circumstances, the mother has not established termination of her rights will be detrimental to the child. And termination is in the child's best interests.

## D. Guardianship

Finally, the father claims "[i]t is in this child's best interests that a guardianship be established, rather than termination of parental rights." Specifically, the father requests that the child be placed in a guardianship with the aunt, claiming, "A.T. has a sibling who has been placed in guardianship with the [same] maternal great aunt. A.T. has been placed throughout the case with the same maternal great aunt and with his sibling and that placement has been stable."

To establish a guardianship in lieu of termination, the court must determine by clear and convincing evidence that "termination of the parent-child relationship would not be in the best interest of the child." Iowa Code § 232.104(4)(a). However, "a guardianship is not a legally preferable alternative to termination." *In re B.T.*, 894 N.W.2d 29, 32 (Iowa Ct. App. 2017). This is because a guardianship does not provide the same level of stability and safety for a child as termination of parental rights and adoption; a guardianship is not permanent. *See In re A.S.*, 906 N.W.2d 467, 478 (Iowa 2018). Here, the court declined to find "that a guardianship of this very young child is at all appropriate." Aside from A.T.'s young age, the court noted evidence in the record that the parents were difficult to work with and demanding regarding visits.

"An appropriate determination to terminate a parent-child relationship is not to be countermanded by the ability and willingness of a family relative to take the child," *In re C.K.*, 558 N.W.2d 170, 174 (Iowa 1997), and the child's best interests always remain the first consideration, *see In re L.M.F.*, 490 N.W.2d 66, 67 (Iowa Ct. App. 1992). Here, A.T.'s interests are best served by termination of parental rights. Although A.T.'s brother is in a guardianship, under these circumstances, we conclude a guardianship status lacks the permanency A.T. needs and deserves. *See In re A.C.*, No. 23-0567, 2023 WL 3612382, at *2 (Iowa Ct. App. May 24, 2023) ("The impermanent nature of guardianships denies children the security and stability that a permanent home provides.").

Having addressed the issues raised on the parents' appeals, we affirm the termination of their parental rights.

**AFFIRMED ON BOTH APPEALS.**